UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELEE WILLIAMS,<br><br>                 Plaintiff,<br><br>      v.<br><br>ROBERT HALF INTERNATIONAL INC.,<br><br>             Defendant. | Case No.  20-cv-03989-KAW<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br>FOLLOWING BENCH TRIAL** |

Plaintiff Kelee Williams was employed for several years by Defendant Robert Half International, Inc. ("RHI"), an international staffing and professional recruiting firm.  Williams earned several promotions during her tenure at RHI, ultimately reaching a Vice President role in the company.  Williams brought this lawsuit against her now-former employer, alleging discriminatory treatment based on her gender, discriminatory pay, and retaliation, among other claims.

The Court conducted a bench trial over several days, from May 1 to May 5, 2023, and continuing from May 8 to May 11, 2023.  Several witnesses testified over the course of the trial, including Williams and some of her former supervisors and colleagues.  The parties submitted their post-trial briefs on June 9, 2023.  They provided revised proposed findings of fact and conclusions of law on June 16, 2023.

For the reasons set forth in this Order, the Court finds, in summary, that Williams demonstrated at trial that she suffered some adverse employment actions, but she failed to meet her burden to show that such actions were based on her gender or related to her complaints of differential treatment.  Williams ultimately did not prove her claims of discrimination or retaliation.  Accordingly, the Court concludes that judgment should be entered in favor of RHI.

### FACTUAL FINDINGS

**1.** On January 7, 2013, Plaintiff Kelee Williams was hired by RHI as an Account Executive within its Management Resources division.  She earned a base salary of $86,000 per year and bonuses pursuant to the Total Rewards Bonus Plan applicable to her position.  Amended Joint Pretrial Conference Statement (Dkt. No. 143); Williams Testimony (Tr. 24:4-12).

**2.** After Williams was hired, the Account Executive job title changed to Client Service Director.  Amended Joint Pretrial Conference Statement (Dkt. No. 143); Williams Testimony (Tr. 25:2-6).

**3.** In 2015, Williams was promoted from Client Service Director to Division Director.  Her salary remained the same and she was eligible to receive bonuses pursuant to the Total Rewards Bonus Plan applicable to Division Directors at the time.  Amended Joint Pretrial Conference Statement (Dkt. No. 143); Williams Testimony (Tr. 25:10-14.)

**4.** In 2015, Williams was promoted further to Branch Manager.  Her salary was increased to $90,000 and she was eligible to receive bonuses pursuant to the Total Rewards Bonus Plan applicable to Branch Managers at the time.  Amended Joint Pretrial Conference Statement (Dkt. No. 143); Williams Testimony (Tr. 26:4-6); Denlinger Testimony (Tr. 1173:22-1174:4).

**5.** In the fall/summer of 2017 and 2018, Williams spoke with her supervisor, Paul Trudeau, regarding work-related conflicts between Williams and her direct report Josh Khoshbin.  On one occasion, Khoshbin became upset with Williams for allegedly stealing a client opportunity from him for her own financial advantage and to his disadvantage.  Khoshbin became upset, raised his voice, used some foul language, and walked out of the common area.  Williams complained to Trudeau about Khoshbin's behavior, but she did not ask him to take any action to discipline or reprimand Khoshbin.  Williams Testimony (Tr. 33:19-34:25); Trudeau Testimony (Tr. 1321:2-12; 1322:9-19); Khoshbin Testimony (Tr. 1270:6-1272:16).

**6.** Two to three months after this incident, Williams requested that Trudeau agree to place Khoshbin on a performance improvement plan for what she deemed as "unethical behavior" by contacting her clients.  Trudeau did not agree with Williams' reasoning for placing Khoshbin on a performance improvement plan because Khoshbin, as Trudeau explained, was just "doing his job."

2

United States District Court
Northern District of California

Trudeau Testimony (Tr. 1324:5-1325:1; 1325:3-1326:2).

**7.** Williams told Trudeau that she had one other work-related dispute with her former employee, Matt Flesch, during which Flesch became upset over Williams failing to include him in a client meeting and used some foul language when speaking about the issue with Williams. However, Williams did not complain that Flesch's comments were based on her gender nor did Trudeau understand that she felt as though she was being treated poorly by Flesch because of her gender. Williams could not state whether Flesch spoke to men similarly. Williams Testimony (Tr. 452:16-454:24; 41:13-42:6); Trudeau Testimony (Tr. 1319:4-20; 1320:18-1321:1).

**8.** During an October 2018 meeting with Marilyn Bird (former District President) and Trudeau, Williams spoke to Bird and Trudeau about Khoshbin's behavior. Williams said she had concerns regarding Khoshbin's stress levels, his negative attitude, wanting to stop his "blow ups," and his respecting her as a leader. Williams was Khoshbin's direct manager at the time, and Williams stated that she wanted to address these issues with Khoshbin. Exhibit A-5; Exhibit A-44; Trudeau Testimony (Tr. 1326:24-1327:7; 1331:25-1333:5).

**9.** Williams also complained to both managers regarding her experience at RHI that women including herself were treated worse than men with respect to compensation and promotion opportunities. Williams Testimony (Tr. 46:10-55:9).

**10.** During the October 2018 meeting with Bird and Trudeau, Williams complained about "bad actors getting special deals." Trudeau Testimony (Tr. 1328:12-19; 1329:6-7).

**11.** On October 28, 2018, Williams received an increase in her salary from $90,000 to $110,000.00. Amended Joint Pretrial Conference Statement (Dkt. No. 143); Trudeau Testimony (Tr. 1386:7-8); Williams Testimony (Tr. 27:14-23; 125:15-20).

**12.** RHI created a Vice President of Managed Business Services ("VP-MBS") position for Williams in or around November of 2018. The promotion to the VP-MBS role included a base salary increase for Williams to $150,000.00. Williams' new position was limited to accounts primarily based in the northern part of the state of Illinois. The new role was focused on generating new clients for RHI's wholly owned subsidiary, Protiviti, Inc., a global consulting business that provides consulting services to large companies. The VP-MBS position required

United States District Court
Northern District of California

Williams to work closely, and successfully, with the Protiviti team.  Because it involved developing business for Protiviti's consulting services, the role focused on fewer, but larger clients, in need of Protiviti's consulting services and, consequently, staffing resources from RHI. Amended Joint Pretrial Conference Statement (Dkt No. 143); Exhibit A-24; Williams Testimony (Tr. 28:25-30:2); Denlinger Testimony (Tr. 1174:11-18; 1202:18-21; 1204:3-6); Trudeau Testimony (Tr. 1309:12-14; 1341:8-1342:6); Hird Testimony (Tr. 790:12-792:1); Masood Testimony (Tr. 1085:19-1086:6).

**13.**      In her VP-MBS role, Williams continued to receive sales credit on accounts that were transitioned and worked on by others after she left her prior position and assumed the VP-MBS position receiving significant bonus compensation on the accounts she worked on previously. Williams Testimony (Tr. 275:23-276:7); Trudeau Testimony (Tr. 1342:23-1343:12).

**14.**      By accepting the VP-MBS role, Williams voluntarily agreed to have fewer client accounts, initially reducing her accounts from 75 to 25.  Client accounts not viewed as prospective clients for Protiviti's services were transitioned from Williams.  The smaller accounts Williams previously served were replaced by accounts that represented some of RHI's largest clients and were more likely to be prospects for MBS services.  Williams Testimony (Tr. 271:13-273:7; 274:15-25.)

**15.**      Williams and Bird discussed the creation of an individualized compensation plan for the new VP-MBS role to account for Williams's decreased number of clients and subordinates. Williams Testimony (Tr. 66:12-72:17).  Bird advised that Hird was working to create an individualized compensation plan.  Williams Testimony (Tr. 70:1-18).

**16.**      Melissa Thompson received an individualized compensation plan when she was in a VP-MBS role in Texas.  Other employees also received individual compensation plans.  Thompson Testimony (Tr. 1058:23-1059:10); Trudeau Testimony (Tr. 1310:15-21; 1381:23-1382:9); Denlinger Testimony (Tr. 661:9-663:6).

**17.**      In 2019, as part of Williams' new role as VP-MBS, Williams made no meaningful progress with most of the accounts she was assigned and failed to develop new accounts. Williams focused her attention on growing just one specific client, Stericycle, while failing to

4

1    make progress with her other assigned accounts.  Hird Testimony (Tr. 799:9-17); Denlinger

2    Testimony (Tr. 1214:23-1215:4); Masood Testimony (Tr. 1082:18-1083:22; 1093:21-1094:3);

3    Thompson Testimony (Tr. 1004:11-1005:6; 1009:20-1010:17; 1011:25-1012:11); Brinkman

4    Testimony (Tr. 1432:4-16).

5    **18.**      In or around April 2019, Williams received a collaboration award alongside colleagues

6    Hani Masood and Tom Young for the revenue generated at Stericycle for the fiscal year of 2018.

7    The award was granted to a team that developed revenue through collaboration utilizing RHI's

8    staffing and Protiviti's consulting, and it did not necessarily mean that everyone on the team was

9    equally collaborative.  Hird Testimony (Tr. 725:16-726:13); Masood Testimony (Tr. 1107:8-18);

10   Young Testimony (Tr. 1515:23-1516:10).

11   **19.**      In or around April of 2019, Bird left RHI.  When she departed, Bird gifted Williams a

12   book titled "Kick Some Glass," which discussed bias and discrimination against women in the

13   workplace.  Bird recounted to Williams her experience in hitting the proverbial glass ceiling as a

14   woman at Robert Half.  Williams Testimony (Tr. 63:22-65:13); Ex. 56.

15   **20.**      After Bird left, Williams began reporting to George Denlinger, Operational President for

16   the Central Zone.  Williams Testimony (Tr. 30:8-31:16).

17   **21.**      In May of 2019, Williams complained to Denlinger that male peers were included in

18   leadership meetings while she was being excluded, and Williams complained that she was

19   excluded from "chart" meetings to which she had been invited under Marilyn Bird.  Denlinger told

20   her she "didn't belong there."  She also complained that her account base was being unfairly

21   eroded and her accounts were given to men, and that she still did not have a compensation plan for

22   her VP-MBS role.  She complained again to Denlinger in July of 2019 about the same topics.

23   Williams Testimony (Tr. 73:13-79:18).

24   **22.**      In December of 2019, Williams complained to Chris Brinkman, the District President and

25   her new direct supervisor, that her account base was being eroded by the assignment of men to

26   accounts that she had long held, such as Walgreens.  Brinkman Testimony (Tr. 1423:13-1428:11);

27   Ex. A-59.

28   **23.**      Williams complained to Denlinger that she was not invited to attend an MBS leadership

United States District Court
Northern District of California

United States District Court
Northern District of California

meeting in Texas.  Denlinger delved into who attended that meeting and found that it related to Hird's budgets and operations, a separate part of the business, and did not relate to Denlinger or his team.  Moreover, Denlinger was not invited, so he did not press further as to why Williams was not invited.  Williams Testimony (Tr. 475:5-15.); Thompson Testimony (Tr. 1013:10-23.); Denlinger Testimony (Tr. 1191:3-15; 1196:22-1197:3).

24.     Williams raised a concern to Brinkman that she was not invited to attend a strategic leadership meeting at the Rosemont location.  Brinkman determined that Williams was not invited to this specific meeting because it was for individuals who managed teams.  Since Williams did not manage other employees in her role as VP-MBS, it was not a meeting she would be invited to attend.  Brinkman Testimony (Tr. 1429:4-13; 1431:9-12; 1429:23-1430:3; 1430:10-21; 1429:23-30); Denlinger Testimony (Tr. 1194:23-1195:1.)

25.     In January of 2020, RHI announced it was hiring for a new role, Regional Vice President, Managed Business Services ("Regional VP-MBS").  The Regional VP-MBS position was to be a "slightly larger" version of Williams's then-current position (VP, MBS), with the Regional VP-MBS position covering more client accounts across a larger geography.  Hird Testimony (Tr. 721:7-13), Ex. 2; Masood Testimony (Tr. 1122:19-1123:7).

26.     On or around January 22, 2020, Williams applied for the Regional VP-MBS position for the Central Region, which covered her northern Illinois home base and reached across several other Midwestern states.  Amended Joint Pretrial Conference Statement (Dkt No. 143); Hird Testimony (Tr. 722:2-4).

27.     On February 3, 2020, Williams interviewed with Hird for the Central Region Regional VP-MBS position at the airport in Phoenix, Arizona.  Hird allotted two hours for the interview.  Originally, the interview was scheduled to take place at RHI's office in San Ramon, California, however it was moved to the Phoenix airport to accommodate the travel schedules of both Hird and Williams.  Hird testified that it was not uncommon to conduct meetings at airports and that he had done so with others, including clients.  Initially, the plan was to conduct the interview at an airport café, but, upon arrival, it was too busy.  Hird moved the meeting to a quieter area than the café, a boarding gate.  Williams had the opportunity to ask questions during the meeting, including

United States District Court
Northern District of California

1    if she wanted to move to a quieter section, yet she declined to do so.  Williams believed the

2    interview went well.  Williams Testimony (Tr. 111:3-112:2); Hird Testimony (Tr. 730:8-732:1;

3    826:14-21; 827:15-828:7; 830:22-831:22); Ex. 4.

4    **28.**    Immediately following the interview in Phoenix, Williams flew to Houston for another in-

5    person interview for the Regional VP-MBS position with another member of Hird's team, Melissa

6    Thompson (née Shipman).  Williams believed that interview went well too.  Not every candidate

7    for the Regional VP-MBS positions was afforded an interview with Thompson.  Williams

8    Testimony (Tr. 112:3-113:13); Hird Testimony (Tr. 821:15-825:3).

9    **29.**    Shortly after the interviews, Hird informed Williams that she was not going to advance any

10   farther in the selection process for the Regional VP-MBS position.  When Williams asked why,

11   Hird informed her that Brinkman told him that she was not a good collaborator.  Williams

12   Testimony (Tr. 114:25-115:24); Hird Testimony (Tr. 732:2-732:15).

13   **30.**    RHI hired Tom Young, a man, for the Central Zone, Regional VP-MBS position.

14   Stipulated Fact (ECF 162) No. 7.  After Beth Brockway applied for and interviewed for the

15   Regional VP-MBS role, the Regional VP-MBS role was split into two, based on geography.

16   Brockway was offered the western part of the Central Zone, including Iowa (where she was

17   located), Kansas, Nebraska, and Colorado.  Young was offered the position covering the eastern

18   part of the Central Zone.  Hird Testimony (Tr. 845:21-846:10; 873:23-874:9.)

19   **31.**    Young was well qualified for the Regional VP-MBS role.  Young has been with RHI for

20   nearly 24 years and was a Managing Vice President of Strategic Accounts, responsible for

21   managing a team of at least seven staff and building a hundred-million-dollar business nationally

22   across RHI's business, not just the management resources line of business in which Williams

23   worked.  Young managed a significant portfolio of some of RHI's most important clients in his

24   earlier role, including Fortune 500 companies, and he was involved in global account management

25   strategies.  Hird Testimony (Tr. 766:12-23; 767:9-21; 767:25-768:2); Young Testimony (Tr.

26   1489:4-5; 1493:9-18).

27   **32.**    Brockway was also well qualified for the Regional VP role.  Brockway was offered the

28   role because she lived in Iowa, had a client base in Iowa, had a history of success cross selling

1   MBS, and had a history of working with clients outside of Iowa.  Hird Testimony (Tr. 845:24-

2   846:7; 775:3-11); Thompson Testimony (Tr. 1057:3-8); Denlinger Testimony (Tr. 1199:12-

3   1201:16).

4   **33.**     Williams was not selected for the Regional VP-MBS role because she did not perform well

5   in the VP-MBS role.  Williams struggled to develop business with new clients or otherwise

6   increase business other than with one client, Stericycle.  In addition to failing to grow business,

7   Hird received feedback from Denlinger, Thompson, Masood, and others that Williams lacked the

8   ability to build trust and collaborative relationships within Protiviti and RHI.  Hird Testimony (Tr.

9   724:23-725:4; 837:3-838:16); Denlinger Testimony (Tr. 1214:3-15); Masood Testimony (Tr.

10  1096:8-1097:15); Thompson Testimony (Tr. 1004:11-18; 1039:5-15; 1045:12-24.)

11  **34.**     In February 2020, when RHI told Williams that she was not going to be offered the

12  Regional VP-MBS role, she was told that the unique VP-MBS role Bird created for her in northern

13  Illinois would be eliminated due to redundancy in job duties with the creation of the Regional VP-

14  MBS position.  While Williams' role covered the Chicago market region only, Young's and

15  Brockway's Regional VP-MBS roles covered all of Illinois and, Ohio, Michigan, Wisconsin,

16  Colorado, Iowa, Minnesota, Nebraska, Texas and the western portion of Pennsylvania.  Hird

17  Testimony (Tr. 807:19-808:9); Denlinger Testimony (Tr. 1205:1-20.)

18  **35.**     Instead of ending Williams' employment, RHI offered Williams a Senior Client Services

19  Director ("Senior CSD") position.  In this position, Williams maintained her salary, was eligible

20  for bonus compensation, and had more client accounts she could sell to as she would be selling

21  RHI's staffing services and not Protiviti's consulting services.  Amended Joint Pretrial Conference

22  Statement (Dkt No. 143); Denlinger Testimony (Tr. 1206:1-1207:20); Trudeau Testimony (Tr.

23  1349:22-1350:22).

24  **36.**     Initially, after accepting the Senior CSD position, Williams was asked to give up three

25  additional accounts because the client accounts were not in her designated geographic location.

26  The accounts were in the downtown Chicago area, not in Hoffman Estates, her home office.

27  Williams Testimony (Tr. 120:16-20); Trudeau Testimony (Tr. 1353:12-21).

28  **37.**     As a Senior Client Services Director, Williams had the opportunity to develop business

beyond her initially assigned accounts without limit.  Trudeau Testimony (Tr. 1353:12-21.)

**38.**     On March 26, 2020, RHI received a litigation hold from Williams' attorney.  Amended Joint Pretrial Conference Statement (Dkt. No. 143).

**39.**     On April 16, 2020, RHI received a draft complaint from Williams' counsel raising contentions of gender discrimination and retaliation, that her bonuses were less than others, that she was left out of meetings, had accounts removed from her, and was denied the promotion to the Regional role.  Exhibit A-02; Amended Joint Pretrial Conference Statement (Dkt. No. 143); Mathurin Testimony (Tr. 917:3-8.)

**40.**     Upon receipt of the compliant, Ted Mawla (RHI Assistant General Counsel) instructed Greg Mathurin (Senior Human Resources Director) to begin his portion of the investigation into Williams's complaint, which was to speak with Williams about allegations in the complaint received from her attorney.  Mathurin met twice with Williams about her complaint.[1]  Exhibit A-15; Mathurin Testimony (Tr. 903:8-23; 1136:20-1137:4; 1138:14-1139:22; 1142:2-1144:7; 1146:9-15).

**41.**     On June 7, 2020, RHI sent a letter to Williams.  The letter contained RHI's conclusion, following its investigation, that Williams had not been subjected to discrimination, retaliation, or unequal pay based on her gender.  Exhibit A-15; Mathurin Testimony (Tr. 909:8-11; 1149:20-1150:3).

**42.**     In August 2020, Williams sought leave under the Family and Medical Leave Act ("FMLA") to care for her mother.  RHI granted her a four week leave for this purpose beginning August 24, 2020.  Williams Testimony (Tr. 141:4-11; 377:2-10).

**43.**     On September 4, 2020, Williams requested an extension of her FMLA leave starting September 7, 2020, until September 20, 2020.  Her request was granted.  Amended Joint Pretrial Conference Statement (Dkt No. 143); Williams Testimony (Tr. 377:19-378:2; 392:25-393:17).

**44.**     On September 9, 2020, Williams requested additional leave to address her own stress and

---

[1] Despite the fact that Mathurin was directed by the Court not to speak to anyone, including RHI counsel, about the case in between his two trial appearances, RHI counsel nonetheless met with him in advance of his examination in RHI's case in chief.  Mathurin Testimony (Tr. 1152:2-22).

anxiety beginning September 21, 2020.  Williams Testimony (Tr. 393:18-25); *see also* Dkt. No. 92.

**45.**     Williams also initiated a request for short-term disability paid leave with Broadspire, RHI's third-party benefits administrator.  At Broadspire's request, Williams's health care provider faxed Broadspire an Attending Physician's Statement regarding Williams's diagnosis and the basis for it.  The document provided an estimated return to work date of October 21, 2021.  Williams Testimony (Tr. 151:3-152:3); Ex. 16.

**46.**     On October 8, 2020, Broadspire representative Tia Johnson emailed Williams about the status of her leave and informed Williams that her medical documentation was incomplete.  Williams Testimony (Tr. 417:13-17).

**47.**     Williams never received short term disability benefits.  While on stress leave, she repeatedly communicated with Broadspire regarding whether there was anything else she could do to support her claim for short-term disability benefits.  Williams also contacted RHI to ask if there was anything else she could do to support her claim for short-term disability benefits.  Broadspire sent Williams a letter dated November 4, 2020, stating that her benefits were denied and that her protected leave was denied and directing her to contact RHI about a return-to-work date.  Williams Testimony (Tr. 149:10-150:19; 164:22-180:24); Exs. 15, 49, 60.

**48.**     RHI records reflect that Williams requested to extend her medical leave on November 16, 2020.  RHI records also show that Williams requested an extension of her medical leave from November 8 to December 20, but that request was cancelled.  Mathurin Testimony (Tr. 930:4-22; 934:17-935:18); Ex. 18.

**49.**     RHI eventually classified Williams as a "no call no show."  Williams Testimony (Tr. 183:20-185:13); Ex. 16.

**50.**     On or around December 16, 2020, Williams sent RHI a doctor's note stating she was unable to return to work until February 1, 2021.  Upon receipt of this note, RHI retroactively approved Williams' leave through that date.  Exhibit 12; Exhibit A-72; Williams Testimony (Tr. 440:7-16); Daley Testimony (Tr. 1474:5-19).

**51.**     On January 15, 2021, Williams sent an email to Trudeau stating that the conditions at RHI

United States District Court
Northern District of California

had impacted her health, "particularly during the period of the events leading up to me raising my concerns about unfair treatment and since raising those concerns.  Given that the environment has not improved, and in light of past treatment, I have concluded that I cannot return to work at Robert Half."  Stipulated Fact (ECF 162) No. 11.

**52.**     Williams's total compensation in 2017 was $259,829.83, of which $90,000 was base salary.  Stipulated Fact Nos. 2-5; Williams Testimony (Tr. 124:17-127:3); Ex. 89.

**53.**     Williams's total compensation in 2018 was $352,641.69.  Her base salary changed from $90,000 to $110,000 to $150,000 throughout that year.  Stipulated Fact Nos. 2-5; Williams Testimony (Tr. 124:17-127:3); Exhibit 89.

**54.**     Williams's total compensation in 2019 was $380,946.53, which was base salary of $150,000 and variable compensation of $230,946.53.  Stipulated Fact Nos. 2-5; Williams Testimony (Tr. 124:17-127:3); Exhibit 89.

**55.**     Williams's total compensation in 2020 was $163,254.29, of which $150,000 was base salary.  Stipulated Fact Nos. 2-5; Williams Testimony (Tr. 124:17-127:3); Ex. 89.

### CONCLUSIONS OF LAW

Williams's remaining claims at the time of trial were for (1) gender discrimination under Title VII, (2) retaliation under Title VII, and (3) retaliation under the Fair Labor Standards Act.

**A.      Gender Discrimination Under Title VII**

Claims of discrimination under Title VII are analyzed using a burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  To prevail, the plaintiff must first establish a prima facie case with evidence establishing she (1) belongs to a protected class, (2) was performing according to her employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than employees with similar qualifications. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640, n.5 (9th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802).  In short, a plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  If a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*,

United States District Court
Northern District of California

11

411 U.S. at 802-04.  "The 'factual inquiry' in a Title VII case is 'whether the defendant intentionally discriminated against the plaintiff.'"  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Burdine*, 450 U.S. at 253).  "In other words, is the employer . . . treating some people less favorably than others because of their . . . sex."  *Id.* (internal quotation marks omitted).

An adverse employment action is conduct materially affecting a plaintiff's compensation, terms, conditions, or privileges of employment.  *Davis v. Team Elec. Co.*, 520 F. 3d 1080, 1089 (9th Cir. 2008).  Failure to include a plaintiff in meetings is an adverse employment action only if her "compensation or business acumen would have improved as a result of attending these [meetings], or that [she would have] enjoyed greater success."  *Blount v. Morgan Stanley Smith Barney LLC*, 982 F.Supp.2d 1077, 1083 (N.D. Cal. 2013).  Failure to promote may be considered an adverse action, however, this requires the plaintiff to establish that: "(1) she belongs to a protected class; (2) she applied for and was qualified for the position she was denied; (3) she was rejected despite her qualifications; and (4) the employer filled the position with an employee not of plaintiff's class, or continued to consider other applicants whose qualifications were comparable to plaintiff's after rejecting plaintiff."  *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).

There is no debate in this case that Williams is a member of a protected class as a woman. The Court accordingly focuses the discussion on the remaining three elements Williams was required to prove as part of her prima facie case: (1) whether she performed according to RHI's legitimate expectations, (2) whether she suffered an actionable adverse employment action, and (3) whether men, situated similarly to Williams, were treated differently.

Williams' gender discrimination claim is based on allegations that RHI: (1) ignored complaints about a few business related arguments and "abusive behavior" by her subordinate Josh Khoshbin and coworker and friend Matt Flesch; (2) reduced her accounts when she received the VP-MBS role; (3) denied her an individual compensation plan during her tenure in the VP-MBS role; (4) excluded her from meetings after she moved to the VP-MBS role in late 2018; (5) denied her promotion to a newly established  Regional VP-MBS position; and (6) demoted her

to a Senior CSD role in March 2020 after she was denied the Regional VP-MBS position.  Only a few of the alleged adverse actions highlighted by Williams constitute adverse employment actions in the Title VII context.  Williams failed to prove that any of the alleged adverse actions were the result of intentional discrimination.  The Court considers the alleged adverse actions in turn.

### 1.    Allegedly Abusive Behavior from Khoshbin and Flesch

Williams alleges RHI ignored complaints about instances of purportedly abusive behavior by her then-subordinate, Josh Khoshbin, and her colleague, Matt Flesch.  Williams testified to three isolated incidents.  The first occurred in 2017 when Khoshbin grew upset when he learned that Williams, then his supervisor, acted on a client opportunity for what he considered her financial gain and his loss.  He expressed his frustration by raising his voice, swearing, and walking out.  While Williams described the outburst differently than Khohshbin at trial, she confirmed that the two had a business argument.  Williams also testified to a second situation where Khoshbin allegedly hid a work order for a client and when Williams indicated that Woodward was on her radar, Khoshbin got "very, very elated, started yelling again, this is bullshit, just thrashing around."  (Tr. 40:8-10.)  Williams provided no evidence that either exchange was attributable to her gender.  (Tr. 1275:23-1276:3; 281:11-13.)  Similarly, Williams testified that she complained in 2017-2018 that Flesch allegedly got upset when he learned that Williams did not invite him to a client meeting, and he responded by saying, "what the fuck, why did you go on that meeting without me? That's bullshit. What the fuck." (Tr. 41:22-42:3.)  Williams failed to identify how such alleged conduct was based on her gender. (Tr. 42:6-14; 452:19-23; 533:22-534:1.)  Further, Williams failed to establish that RHI failed to appropriately address either incident or otherwise subjected her to harassing treatment based on her gender.  In fact, Trudeau and Khoshbin testified that Trudeau followed up with Khoshbin after the incident and coached him on how to better handle conflicts and let him know that he could not speak with Ms. Williams in a disrespectful manner.  Trudeau Testimony (Tr. 1321:13-19; 1322:20-1323:10;); Khoshbin Testimony (Tr. 1275:1-12).  Regardless of whether RHI appropriately addressed the incidents, Williams failed to show that these isolated disputes rose to the level of an adverse employment action. *Kortan v. State of California*, 5 F.Supp.2d 843, 853 (C.D. Cal. 1998)

13

("Hostility from fellow employees . . . [is] not [an] adverse employment action"); *Campbell v. Knife River Corp. Nw.*, 783 F. Supp. 2d 1137, 1150 (D. Or. 2011); *Kosegarten v. Dep't of Prosecuting Att'y*, 2013 WL 655461, at *18 (D. Haw. Feb. 21, 2013). Williams did not establish that any "verbally abusive behavior" by her subordinate and co-worker was an adverse employment action that materially affected her compensation, terms, conditions, or privileges of her employment. *See Davis*, 520 F.3d at 1089.

### 2.    Reduced Accounts Upon Promotion to VP-MBS

Williams alleges that she suffered an adverse employment action in the form of reduced accounts when she received the VP-MBS role. However, RHI and Williams agreed that her client accounts would be reduced and transitioned when she accepted the VP-MBS role. (Tr. 265:25-266:8, 1173:9-21, 1341:22-25, 1342:10-21.) As part of this process, Williams agreed to reduce her client list from 75 to 25 accounts and gave up smaller companies, which would not need Protiviti's services, while keeping and gaining significant national accounts. (Tr. 72:10-11, 272:13-15, 273:18-273:13, 521:21-522:2, 1173:9-21.) Williams acknowledged that the reduction of her client list to focus on fewer, but larger, client accounts was part of her promotion to the VP-MBS role. (Tr. 272:22-25; 274:22-25; 790:12-18, 1085:9-25.) The reduction in Williams's client list could hardly be considered an adverse employment action in the context of her promotion to VP-MBS. Even assuming the reduction in her client list constituted an adverse action based on its overall effect on Williams's employment, Williams failed to establish at trial that this conduct was based on her gender.

### 3.    Failure to Provide Compensation Plan

Williams alleges that RHI's failure to provide her with a compensation plan constituted an adverse employment action. RHI did not grant Williams an individualized compensation plan while she was in the VP-MBS role even though Melissa Thompson received an individualized compensation plan when she was in a similar VP-MBS role and other employees also received individual compensation plans. Thompson Testimony (Tr. 1058:23-1059:10); Trudeau Testimony (Tr. 1310:15–21; 1381:23–1382:9); Denlinger Testimony (Tr. 661:9–663:6). Williams did not present evidence that similarly situated men were treated differently. As with several of Williams'

14

1   other allegations, she failed to establish that RHI's failure to provide her with an updated

2   compensation plan was based on her gender.

3       **4.   Exclusion from Meetings**

4       Williams alleges that RHI's exclusion of her from meetings constituted adverse

5   employment actions.  At trial, Williams was only able to identify one leadership meeting in Texas

6   to which she was not invited.  However, that meeting related to Hird's budgets and operations and

7   did not impact Williams.  Williams failed to establish that her inclusion in the meeting would have

8   improved her business acumen or her chances of success, and she thus failed to prove that her

9   exclusion from the meeting constituted an adverse action.  *See Blount*, 982 F. Supp. 2d at 1083.

10  Moreover, while Williams was not invited, other women attended the meeting, including Melissa

11  Thompson, demonstrating that the exclusion of Williams was not based on gender.  Williams

12  separately complained to Brinkman about her exclusion from a meeting in the Rosemont office,

13  but Brinkman determined that Williams was not invited to this specific meeting because it was for

14  individuals who managed teams, a category of executives to which Williams did not belong.

15  Williams provided no evidence of any connection to her gender or that gender was a factor in

16  determining attendance or exclusion from these or any meetings.

17      **5.   Treatment During Interview Process for Regional VP-MBS**

18      Williams advances that her treatment in the interview process for the Regional VP-MBS

19  position constituted an adverse action in that Hird never considered her a genuine candidate and

20  had predetermined Young's candidacy.  The interview was initially scheduled to take place in San

21  Ramon but moved to the airport in Phoenix to facilitate easier travel for Williams and Hird.  It is

22  undisputed that Hird also interviewed Young in an airport.  Hird allotted two hours to speak with

23  her in a café in the airport, suggesting that he did not plan to ignore her or give her candidacy short

24  shrift.  Upon arrival, Hird attempted to accommodate Williams by moving their interview to a

25  quieter area in the airport even though meeting in the gate area was less than ideal.  Williams did

26  not complain at the time, and she believed the interview went well.  Other applicants did not have

27  the opportunity to interview in person, being left only with a phone interview with Hird.  Other

28  applicants did not have the opportunity to meet with Thompson in Texas.  Williams thus failed to

1    establish that the treatment she received while interviewing for the Regional VP-MBS position

2    constituted an adverse employment action.

3            Williams argues that RHI's denial of her candidacy for the Regional VP-MBS position in

4    favor of two other candidates was an adverse employment action.  Williams was not found to be

5    qualified for the position since she failed to succeed in the smaller MBS pilot role which had far

6    fewer performance expectations than the Regional role.  Hird Testimony (Tr. 840:14-841:13).

7    While serving in the smaller MBS pilot role, she was unable, over the course of a year, to secure

8    new clients in the one state for which she was responsible, Illinois.  In her VP/MBS role, Williams

9    failed to generate any new client business or revenue.  (Tr. 840:20-841:5.)  Williams's failure to

10   meet minimum expectations shows she was unqualified to assume an expanded role which

11   required her to develop a much larger number of new clients in multiple states.  Because Williams

12   did not perform according to RHI's legitimate expectations at the time she was denied the

13   promotion, she did not prove her prima facie case of discrimination under Title VII.  *See Vasquez*,

14   349 F.3d at 640, n.5.  Moreover, Hird received feedback from multiple people (many of whom had

15   no knowledge of Williams's complaints to management, including Thompson and Masood) that

16   Williams lacked the ability to build trust and collaborative relationships within Protiviti and RH,

17   and that Young was better qualified.  (Tr. 841:6-10, 1038:7-15, 1213:20-15, 1097:4-15.)  In

18   contrast to Williams, Brockway and Young each had demonstrated success with MBS and

19   building relationships between Protiviti and RHI and their credentials were stronger.  Williams did

20   not present any evidence to suggest that her candidacy was rejected based on her gender.

21   Williams could not establish such treatment was based on her gender because another woman,

22   Brockway, was ultimately hired to the Regional VP-MBS position in a split of the Central Region.

23   Williams thus failed to prove that the selection of the other two candidates for the Regional VP-

24   MBS position supports her claim of discrimination.

25           Williams argues in her post-trial briefing that RHI offered shifting rationales for her

26   rejection from the Regional VP-MBS role, but the shifting rationales analysis only impacts the

27   question of whether a defendant's legitimate business rationale for an adverse employment action

28   is pretextual.  The pretext analysis falls at the end of the burden-shifting analysis, only after the

United States District Court
Northern District of California

plaintiff first makes a prima facie showing of a discriminatory adverse employment action. Williams has not made a prima facie showing of discrimination here. The burden-shifting analysis therefore does not proceed past the first step, and the Court need not address whether RHI's rationale for selecting Young and Brockaway over Williams was pretextual.

### 6. Demotion to Senior Client Services Director

Williams transitioned to Senior Client Services Director ("Senior CSD") after she was rejected for the Regional VP/MBS position. In February 2020, when RHI told Williams that she was not going to be offered the Regional VP-MBS role, she was also told that the unique VP-MBS role she held for the previous months would be eliminated due to redundancy in job duties with the creation of the Regional VP position. RHI offered Williams a Senior CSD position that catered to her strengths at the same base salary of $150,000 and with unlimited commission potential. (Tr. 235:17-19, 1350:3-8.) Indeed, Williams had the opportunity to make more money in this role than in any previous position she held at RHI. Williams's move from her VP-MBS role to the Senior CSD role was clearly a demotion despite RHI's effort to establish otherwise at trial. However, Williams failed to prove at trial that any similarly situated employee was treated differently. Williams failed to establish that the demotion had anything to do with her gender.

### 7. Constructive Discharge

In addition to the singular allegations of discriminatory treatment Williams alleges she suffered, Williams advances a theory of constructive discharge based on their sum. The Ninth Circuit has clarified that

> constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.

*Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). To establish constructive discharge, a plaintiff must show (1) "working conditions so intolerable that a reasonable person would have felt compelled to resign," *Penn. State Police v. Suders*, 542 U.S. 129, 148 (2004), and (2) that she actually resigned, *Green v. Brennan*, 578 U.S. 547, 555 (2016). The Ninth Circuit acknowledges that "We set the

United States District Court
Northern District of California

bar high for a claim of constructive discharge." *Poland*, 494 F.3d at 1184.

To support her contention of constructive discharge, Williams points to ignored complaints about discrimination and equal pay, exclusion from meetings, the denial of a promotion, a demotion, a sham investigation into her complaints, and manipulation of a protected leave of absence. Among these occurrences, Williams contends that a prime driver of her resignation was the treatment she received from Broadspire in the administration of her short-term disability claim, including Broadspire's demands for additional, invasive medical records as well as Broadspire's ultimate denial of her claim. Williams did not present any evidence at trial that RHI interfered with Broadspire's claims administration, that RHI guided Broadspire's claims administration, or that the ultimate denial of the claim was in any way attributable to RHI. RHI cannot be held responsible for the independent acts of Broadspire, a third-party benefits administrator. Broadspire's treatment of Williams and its denial of short-term disability benefits therefore does not factor as an act attributable to RHI for purposes of constructive discharge.

Following receipt of the draft employment discrimination complaint sent by Plaintiff's counsel, RHI initiated an investigation into Williams's allegations of maltreatment. Williams advances that RHI's internal investigation was a sham and that it constituted another adverse employment action. However frustrating for RHI to minimize or misreport her complaints, Williams did not prove at trial that the allegedly sham investigation constituted an adverse employment action that materially affected the terms, conditions, or privileges of her employment. Williams did not prove that the allegedly sham investigation made her working conditions intolerable.

The remaining evidence, considered together, is simply insufficient to support a finding that Williams's working conditions were so egregious that she had no alternative except to quit. Significantly, the Court notes that Williams's reports of being excluded from meetings are overblown and that Williams failed to establish that her denial of a promotion and demotion were related to her gender. The evidence at trial demonstrated that RHI accommodated Williams's continued employment by making the Senior CSD role available to her rather than terminating her, by maintaining her base salary, and by placing her in a role in which her prior experience

suggested that she would be successful—selling RHI staffing services and not supervising any staff.  Williams did not establish at trial that RHI engaged in a continuous pattern of discriminatory treatment, as is necessary to prove constructive discharge.  *See Satterwhite v. Smith*, 744 F.2d 1380, 1381-82 (9th Cir. 1984).  Therefore, the Court finds that Williams fails to provide evidence sufficient to show that she suffered an adverse employment action through constructive discharge.

### 8.    Conclusion – Discrimination Under Title VII

The Court finds that some of the instances described above constituted adverse employment conduct because they materially affected the terms of Williams's employment.  For nearly all the allegations, however, Williams failed to present evidence that similarly situated men were treated differently or that such treatment was based on her gender.  Particularly related to her rejection for the Regional VP-MBS position, Williams failed to establish that she performed to RHI's legitimate expectations—she underperformed as VP-MBS.  Therefore, Williams failed to prove the elements of her prima facie case of disparate treatment under Title VII, and under the burden-shifting framework of *McDonnell Douglas*, 411 U.S. at 802-04, there is no need to reach whether RHI had a legitimate business reason for its conduct.  Moreover, Williams failed to prove that she suffered an adverse action in the form of constructive discharge.  Plaintiff failed to prove that these instances of adverse employment actions constituted unlawful discrimination under Title VII.

### B.    Retaliation Under Title VII

To establish a retaliation claim, a plaintiff must first show that she: (1) "engaged in a protected activity"; (2) "suffered an adverse employment action"; and (3) "there was a causal connection between the two."  *Maner v. Dignity Health*, 9 F.4th 1114, 1120 (9th Cir. 2021).  Under Title VII, a plaintiff must establish the protected activity "was a but-for cause of the alleged adverse action."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  Even where an employer's conduct does not violate Title VII, "the statute protects an employee who opposes employer conduct in the mistaken but reasonable belief that the conduct is unlawful."  *Maner*, 9 F.4th at 1127 (citation omitted).

United States District Court
Northern District of California

1    **1.    Protected Activity**

2         The evidence confirmed that Williams had a number of discussions with her managers

3    about her frustration with coworkers, her compensation, and her accounts.  Williams testified that

4    she complained to Brinkman, Denlinger, Hird, and Trudeau, but while they all acknowledged that

5    Williams made some complaints, each RHI witness denied that anything Williams stated, implied,

6    or otherwise conveyed led them to believe that the concerns she raised were gender related.  The

7    Court discusses below whether the instances of Williams's complaints constituted protected

8    activity.

9         There is no dispute that in 2017-2018, Williams spoke to Trudeau about work-related

10   conflicts with Khoshbin and Flesch.  However, Williams did not contend that Khoshbin's or

11   Flesch's statements were anything but work-related disputes about client or candidate ownership.

12   Williams's complaints about Khoshbin and Flesch did not constitute protected activity.

13        Williams met with Hird in October and December 2018, but Williams never mentioned

14   any concerns she had about RHI's treatment of women, promotional opportunities, or

15   compensation in comparison to men, or abuse by co-workers.  Williams did not share: (1) that she

16   was being abused by men, (2) any frustration about losing accounts, (3) concerns about how she

17   was being treated compared to men, or (4) that women were not receiving promotion

18   opportunities.  Williams's discussions with Hird in October and December 2018 did not constitute

19   protected activity.

20        In contrast, there is evidence that Williams complained of differential treatment based on

21   gender to Bird in October 2018.  Williams complained of workplace outbursts by Khoshbin and

22   Flesch, and she also referred to inequities in compensation and promotion opportunities.  Williams

23   complained of "bad actors getting special deals," and noted that Flesch had been promoted over

24   another woman.  (Tr. 1328:12-19, 1329:6-7.)  Following that conversation, Bird gifted a book to

25   Williams titled "Kick Some Glass."  Ex. 56.  Bird's handwritten inscription encourages Williams

26   to continue to stand up for equality for women at RHI.  RHI half-heartedly attempted to suggest

27   that, despite its clear title and Bird's inscription, it was simply a "self-help" book.  However, the

28   evidence shows the book to be about dealing with gender discrimination in the workplace.  (Tr.

1    611:10-17; 614:7-13.)  In context, Williams's complaints to Bird constituted protected activity.

2        In May of 2019, Williams complained to Denlinger that male VP peers were included in

3    MBS leadership meetings (for VPs and above) as well as leadership development opportunities

4    (e.g., Tom Young, Paul Trudeau), and she was being excluded, as well as being excluded from

5    "chart" meetings to which she had been included under Marilyn Bird.  Denlinger told her she

6    "didn't belong there."  She also complained that her account base was being unfairly eroded and

7    her accounts were given to men.  (Tr. 73:13-79:18.)  Williams's complaints to Denlinger in May

8    2019 constituted protected activity.

9        In a subsequent meeting with Denlinger sometime in June or July 2019, Williams said she

10   generally expressed "concerns to level the playing field for myself as a woman."  (Tr. 79:11-18.)

11   Denlinger conversely testified that during this timeframe, Williams did not raise any complaints

12   regarding discrimination in the workplace, abuse by male colleagues, unfair treatment related to

13   pay, that she was being removed from accounts, or that men were being placed on her accounts.

14   (Tr. 1193:13-1194:1.)  Williams's complaints to Denlinger in June or July 2019 constituted

15   protected activity.

16       At no time during October or November 2019 did Williams raise a concern with

17   Brinkman, her new direct supervisor, about her compensation plan, that her accounts were being

18   unfairly given to men, that she was being abused because of her gender, nor did the subject of the

19   number of her accounts come up.  (Tr. 1420:17-1421:7.)  Williams eventually asked Brinkman

20   why she was not included in a leadership meeting at the Rosemont location, but she did not state

21   that this was related to gender.  (Tr. 1194:23-1195:1, 1429:4-13, 1431:9-12.)  Brinkman

22   investigated Williams' concern about being excluded from the meeting and determined that the

23   Rosemont meeting was for employees who managed people, a job duty that Williams did not have

24   as VP-MBS.  (Tr. 1429:23-1430:3, 1430:10-21.)  While Williams never stated she felt excluded

25   due to her gender, Brinkman, nonetheless, confirmed that several other women were invited to the

26   Rosemont meeting.  (Tr. 1429:23-30.)  Williams's complaints to Brinkman about her exclusion

27   from meetings did not constitute protected activity.

28       Text messages between Williams and Denlinger in late December 2019 further support her

United States District Court
Northern District of California

testimony that she complained to Denlinger about Brinkman putting two men on the Walgreen's account.   Ex. 57.   Plaintiff told Denlinger in the follow up call that she was not naïve and could see what was happening, that she collaborates but in return her accounts get shared with men.   (Tr. 602:11-603:15.)   Williams's complaints in December 2019 constitute protected activity.

### 2.   Adverse Actions

Williams failed to prove a causal connection between her alleged complaints and any alleged adverse employment action.

Williams's claim that she was excluded from meetings because of her complaints has no support.   Any meeting she was "excluded from" either did not happen (Denlinger never scheduled chart or zone meetings), did not involve her (meetings about Hird's budgets and operation did not impact her or Denlinger who was also not invited) (Tr. 1187:17-22) or involved people managers, which she was not (Tr. 1430:4-21).

As discussed above, Williams's accounts were not reduced as an adverse action because she agreed to reduce her accounts when she was promoted to the VP-MBS role.   (Tr. 265:25-266:8, 266:9-18, 1341:5-11, 1341:18-25, 1342:10-21.)   Relatedly, the addition of men to Williams's former accounts was something to which she agreed in accepting the promotion to VP-MBS, not something done by RHI in retaliation for her complaints.   As discussed above, she agreed to reduce her accounts when she was promoted to the pilot VP-MBS role to provide her bandwidth to grow other key accounts relevant to Protiviti, and it was necessary to assign additional executives to Williams's former accounts to ensure continuity of service.   (Tr. 265:25-266:8, 266:9-18, 1341:5-11, 1341:18-25, 1342:10-21.)   But further, as Williams transitioned from the VP-MBS role to the Senior CSD role, she was required to give up three of eight accounts— these accounts were not taken from her because of her gender but because those accounts were in the geography covered by the downtown Chicago branch rather than the geography covered by the Hoffman Estates branch where she worked.   (Tr. 120:13-20.)   Williams failed to prove any nexus between the allegedly adverse action of reduction in her accounts and her protected activity.

Williams was not offered the Regional VP-MBS role because she was not as qualified as Young or Brockway.   No evidence suggested that such a decision was made in retaliation for

1    Williams' complaints.  Rather, Williams was denied the Regional VP-MBS role because RHI

2    reasonably selected more qualified candidates.  In her VP-MBS role, Williams failed to generate

3    any new client business or revenue.  (Tr. 840:20-841:5.)  Moreover, Hird received feedback from

4    multiple people (many of whom had no knowledge of her complaints, including Thompson and

5    Masood) that Williams lacked the ability to build trust and collaborative relationships within

6    Protiviti and RHI, and that Young was better qualified.  (Tr. 841:6-10, 1038:7-15, 1213:20-15,

7    1097:4-15.)  In contrast to Williams, Brockway and Young each had demonstrated success with

8    MBS and building relationships between Protiviti and RH, and their credentials were stronger.  No

9    evidence suggested that such a decision was made in retaliation for Williams' complaints.

10         Williams advances that RHI failed to investigate her complaints of discrimination in

11   retaliation for her complaints.  However, "failure to investigate" is insufficient to establish an

12   adverse employment action or pretext for retaliation.  *See Huddleston v. City of S.F.*, 2016 WL

13   4729175, at *4 (N.D. Cal. Sep. 12, 2016) (allegations that defendants failed to investigate are

14   insufficient to raise an inference that defendants' failure to act was retaliatory); *Brown v. Dignity*

15   *Health*, 2020 WL 3403088, at *7 (D. Ariz. June 19, 2020) ("an inadequate investigation is not an

16   adverse employment action under Title VII").  RHI's investigation following its receipt of

17   correspondence from Plaintiff's counsel could have been more thorough and certainly left

18   something to be desired, but Williams did not put forth any evidence that the failure to investigate

19   materially impacted the terms and conditions of her employment.  RHI's alleged failure to

20   investigate did not itself constitute an adverse employment action, and Williams did not establish a

21   nexus between the failure to investigate and her earlier complaints.

22         **3.      Conclusion – Retaliation under Title VII**

23         In sum, the Court finds that Williams failed to prove her claim of retaliation under Title

24   VII because while she did engage in some protected activity, Williams failed to establish that she

25   suffered adverse employment actions as a result or in response to her complaints of differential

26   treatment of women.

27   **C.     Retaliation Under the Fair Labor Standards Act**

28         The Fair Labor Standards Act ("FLSA") only protects complaints that are "under or related

United States District Court
Northern District of California

1    to" the FLSA.  *See* 29 U.S.C. § 215(a)(3).  An employee's complaint to an employer must be

2    "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content

3    and context, as an assertion of rights protected by the statute and a call for their protection."

4    *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

5        Williams advances that she engaged in protected activity by complaining to her managers,

6    her manager's managers, and Human Resources about unequal pay at RHI multiple times

7    including in 2018, 2019, and 2020, including that her male peers were being paid bonuses for

8    work on accounts where she was not, and her accounts were being eroded and given to men,

9    negatively affecting her compensation.  However, Williams did not establish that her complaints

10    to RHI management constituted a clear assertion of rights protected under the FLSA.  The content

11    and context of Williams's complaints to Bird, Denlinger, and Brinkman did not make clear that

12    she sought the protection of the FLSA.  To the extent Williams had conversations with RHI

13    regarding her employment, based on the content of those conversations, they could not and were

14    not understood to be an assertion of rights protected by the FLSA and a call for protection of those

15    rights.

16        Williams additionally advances that she engaged in protected activity in the form of

17    correspondence from her counsel.  That is, on April 16, 2020, RHI received a draft complaint from

18    Williams's counsel raising contentions of gender discrimination and retaliation, that her bonuses

19    were less than others and that she had accounts removed.  Exhibit A-02; Amended Joint Pretrial

20    Conference Statement (Dkt No. 143).  This formal assertion of Williams' rights more clearly

21    demonstrated an intent to fall within the FLSA's protections.  However, Williams failed to show

22    that she suffered an adverse employment action as a result of the complaints made in the form of

23    the draft complaint.  The only actions which may give rise to a claim for retaliation in violation of

24    the FLSA are those that occurred after the legally protected complaint in April 2020.  *Pham v. City*

25    *of Seattle*, 7 F. App'x 575, 577 (9th Cir. 2001) (only adverse employment actions occurring after

26    the protected complaint can be used to satisfy the causality prong of a retaliation claim).  The only

27    adverse actions to which Williams can point after April 2020 are those allegedly resulting in her

28    constructive discharge, actions which the Court finds are insufficient to establish an adverse

United States District Court
Northern District of California

employment action for the reasons discussed above.  Further, there is no causal connection between Williams's alleged adverse employment actions and the April 2020 complaint.  The Court accordingly finds that Williams failed to prove her claim of retaliation under the FLSA.

## CONCLUSION

Accordingly, the Court finds that judgment must be entered in favor of the Defendant. Defendant shall file a proposed form of judgment, approved as to form by Plaintiff, within seven (7) business days of this Order.

**IT IS SO ORDERED.**

Dated: September 27, 2023

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California